**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DALE MORTENSEN; MELISSA
BECKER, individually and on behalf
of themselves and all others
similarly situated,
                *Plaintiffs-Appellees*,

v.

BRESNAN COMMUNICATIONS, LLC, a
Delaware corporation,
                *Defendant-Appellant*.

No. 11-35823

D.C. No.
1:10-cv-00013-
RFC

OPINION

Appeal from the United States District Court
for the District of Montana
Richard F. Cebull, Chief District Judge, Presiding

Argued and Submitted August 31, 2012
Submission Withdrawn October 9, 2012
Resubmitted April 19, 2013
Seattle, Washington

Filed July 15, 2013

Before: Mary M. Schroeder and Ronald M. Gould, Circuit Judges, and Jed S. Rakoff, Senior District Judge.[*]

Opinion by Judge Gould

## SUMMARY[**]

### Arbitration

The panel vacated the district court's order declining to enforce an arbitration clause and a choice-of-law clause in a broadband Internet service subscriber agreement, and remanded to the district court with instructions to apply New York law to the arbitration agreement.

The panel held that *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), further limited the Federal Arbitration Act's savings clause, 9 U.S.C. § 2. The panel held that the Federal Arbitration Act preempted Montana's public policy invalidating adhesive agreements running contrary to the reasonable expectations of a party. The panel also held that the district court erred in not applying New York law because a state's preempted public policy was an impermissible basis on which to reject the parties' choice-of-law selection.

---

[*] The Honorable Jed S. Rakoff, Senior District Judge for the United States District Court for the Southern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

John D. Seiver (argued), Adam S. Caldwell, and Ronald G. London, Davis Wright Tremaine LLP, Washington, D.C.; William Scott Mitchell and Michael P. Manning, Holland & Hart, LLP, Billings, Montana, for Defendant-Appellant.

Scott A. Kamber (argued) and David A. Stampley, KamberLaw, LLC, New York, New York; Deborah Kravitz, KamberLaw, LLC, Healdsburg, California; Gregory P. Johnson, Johnson Law Office, Billings, Montana, for Plaintiffs-Appellees.

---

**OPINION**

GOULD, Circuit Judge:

This case involves a binding arbitration clause in a contract of adhesion between a commercial provider of high-speed, broadband Internet services and its customers. We consider the relationship of state and federal law and the concept of preemption in this context.[1] Dale Mortensen and Melissa Becker ("Plaintiffs") brought this putative class action against Bresnan Communications alleging violations of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2520–21, the Computer Fraud and Abuse Act, 18 U.S.C.

---

[1] We originally vacated submission of the present case pending an en banc decision of this court. The en banc court did not reach the issue in the present case. *See Kilgore v. KeyBank, Nat'l Ass'n*, __ F.3d __, Nos. 09-16703, 10-15934, 2013 WL 1458876, at *5 (9th Cir. Apr. 11, 2013) (en banc) (reversing on state grounds the district court's denial of a motion to compel arbitration).

§ 1030, and Montana state law for invasion of privacy and trespass to chattels in connection with targeted advertising that they received while using Bresnan's Internet service. The service subscriber agreement provided to all Bresnan customers contained a choice-of-law clause, specifying that New York law should apply, and an arbitration clause, both of which the district court declined to enforce.

We consider, in light of the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, __ U.S. __, 131 S. Ct. 1740 (2011), whether the Federal Arbitration Act ("FAA"), Pub. L. No. 68-401, 43 Stat. 883 (1925) (codified as amended at 9 U.S.C. §§ 1–2 et seq.), preempts Montana public policy invalidating adhesive agreements running contrary to the reasonable expectations of a party.[2]  We then address the choice-of-law consequences flowing from that holding.  We have jurisdiction pursuant to 9 U.S.C. § 16(a)(1)(A)–(B). *See Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173, 178 (4th Cir. 2013); *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 604 (4th Cir. 2013).

Our decision turns on an interpretation of *Concepcion*'s meaning and breadth.  After analyzing both *Concepcion* and subsequent cases, we conclude that *Concepcion* further limited the FAA's savings clause, 9 U.S.C. § 2, and therefore hold (1) that the FAA preempts Montana's reasonable expectations/fundamental rights rule and (2) that the district court erred in not applying New York law because a state's preempted public policy is an impermissible basis on which to reject the parties' choice-of-law selection.  Consequently,

---

[2] This Montana rule was judicially established in *Iwen v. U.S. West Direct*, 977 P.2d 989, 995 (Mont. 1999) and *Kortum-Managhan v. Herbergers NBGL*, 204 P.3d 693, 698–99 (Mont. 2009).

we vacate the district court's denial of Bresnan's motion to compel arbitration and remand to the district court with instructions to apply New York law to the arbitration agreement.[3]

## I

We start with the facts giving rise to the dispute.  Then we turn to the district court proceedings and present appeal.

### A.  The Facts Underlying Class Plaintiffs' Claims

Plaintiffs, who reside in or near Billings, Montana, formerly subscribed to Internet services from Bresnan Communications, a franchised cable-television provider incorporated in Delaware, headquartered in New York, and operating in Montana, Colorado, Wyoming, and Utah.  Class representative Dale Mortensen started services with Bresnan in October 2007. Bresnan has no record of a customer named Melissa Becker, although the company does not foreclose the possibility that she or another member of her household contracted for Internet service.

After customers subscribe to Bresnan's services, technicians deliver a "Welcome Kit" to their homes and install the equipment necessary to activate the service.  The "Welcome Kit" contains the Bresnan OnLine Internet Service

---

[3] Although Plaintiffs' initial opposition brief in response to Bresnan's motion to compel arbitration seems to concede that an application of New York law would require arbitration, Plaintiffs now state that they merely noted that New York courts are less sensitive to consumer contract rights. Either way, given that New York law generally favors arbitration, which law applies may be outcome determinative.  We leave that issue to be decided in the first instance by the district court on remand.

Subscriber Agreement and Acceptable Use Policy ("service agreement"), which is also available on Bresnan's website. On Page 21 of the 31-page service agreement, in bold, large font, is the heading "9. Arbitration." Paragraph 9(a.) states:

> ***Binding Arbitration.*** ANY AND ALL DISPUTES ARISING BETWEEN CUSTOMER AND BRESNAN COMMUNICATIONS (WHETHER BASED IN CONTRACT, STATUTE, REGULATION, ORDINANCE, TORT—INCLUDING, BUT NOT LIMITED TO, FRAUD, ANY OTHER INTENTIONAL TORT OR NEGLIGENCE,—COMMON LAW, CONSTITUTIONAL PROVISION, RESPONDEAT SUPERIOR, AGENCY OR ANY OTHER LEGAL OR EQUITABLE THEORY), WHETHER ARISING BEFORE OR AFTER THE EFFECTIVE DATE OF THIS AGREEMENT, MUST BE RESOLVED BY FINAL AND BINDING ARBITRATION. THIS INCLUDES ANY AND ALL DISPUTES BASED ON ANY PRODUCT, SERVICE OR ADVERTISING CONNECTED TO THE PROVISION OR USE OF THE SERVICE. The Federal Arbitration Act ("FAA"), not state law, shall govern the arbitrability of all disputes between Bresnan Communications and Customer regarding this Agreement and the Service. Bresnan Communications and Customer agree, however, that New York or federal law shall apply to and govern, as appropriate, any and all claims or causes of

> action, remedies, and damages arising
> between Customer and Bresnan
> Communications regarding this Agreement
> and the Service, whether arising or stated in
> contract, statute, common law, or any other
> legal theory, without regard to New York's
> choice of law principles.[4]

The substance of this paragraph has remained unchanged since 2003.[5] The beginning of the service agreement directs customers to, "Please read this Agreement very carefully, because by accepting the Service, you agree to all of these terms."

In 2008, Bresnan entered into a temporary arrangement with advertising company NebuAd, Inc. Under the arrangement, in exchange for a share of NebuAd's advertising revenue, Bresnan allowed NebuAd to place an appliance in its Billings, Montana, network. The appliance allowed NebuAd to gather information and create profiles of subscribers in order to target them with preference-sensitive advertising. Bresnan contends that it provided specific notice to consumers about the NebuAd trial and allowed individuals

---

[4] The service agreement further states that "[a]ll parties to the arbitration must be individually named" and that "[t]here shall be no right or authority for any claims to be arbitrated on a class action or consolidated basis." But that provision is not challenged on appeal.

[5] The only amendment to this provision involved updating the notification address for Bresnan's Legal Department.

to opt out.  Under a heading labeled "About Advanced Advertising," the company website provided detailed information about the trial.[6]  It also gave a list of thirteen

---

[6] The text under that heading reads:

> Bresnan Communications is testing a new and exciting feature that will improve the relevance of advertising on the Internet.  Using anonymous web surfing technology, banner ads will be customized to our customers' specific interests—reducing the "clutter" normally associated with Internet advertising.  We're confident that this feature will provide a more enjoyable browsing experience for our customers.

> We are committed to our customers' privacy and we have placed great importance on two fundamental philosophies in relation to advanced advertising.  First, participation in advanced advertising is completely voluntary.  Second, neither Bresnan nor our participating web sites or ad networks will ever collect any personally identifiable information—such as names or email addresses–In [sic] our efforts to provide this valuable feature to our subscribers.

> Following is a list of frequently asked questions regarding our advanced advertising service, complete with an option to opt-out of this service if desired.

> [FAQs omitted]

> **Your Participation is Optional**

> Thank you for taking the time to learn about Bresnan's advanced advertising initiative.  If you would like to opt-out of this service, simply click this link.  Note that your opt-out will only apply to this browser on this computer.  If you use more than one browser (such as Firefox and Microsoft Internet Explorer), or more than

frequently asked questions with corresponding answers that assured customers that no personally identifying information, such as first and last name, physical street address, email address, telephone numbers, or social security numbers would be collected.    Plaintiffs contend that this notice was misleading and that consent was never obtained.

## B.  The Facts Underlying Plaintiffs' Appeal

After NebuAd's temporary arrangement with Bresnan to gather information from the subscribers ended, a class of plaintiffs, including those involved in the present action, brought suit in the United States District Court for the Northern District of California against NebuAd and several Internet service providers who hosted NebuAd appliances, including Bresnan.  Bresnan and the other providers moved to dismiss the action for lack of personal jurisdiction and failure to state a claim.  The district court granted this motion finding personal jurisdiction lacking. *Valentine v. NebuAd, Inc.*, No. C08-05113 TEH, 2009 WL 8186130, at *3–10 (N.D. Cal. Oct. 6, 2009).  NebuAd became the sole defendant in that action and eventually reached a court-approved settlement with the plaintiffs.

But before reaching that settlement in the initial lawsuit, groups of plaintiffs filed new class actions in their respective states.  Plaintiffs brought suit against Bresnan in the United States District Court for the District of Montana re-alleging

---

one computer (such as a desktop computer and a laptop), you will need to re-visit this page and opt-out for each.

A total of eighteen subscribers purportedly opted out.

violations of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2520–21, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, while also asserting state-law claims for invasion of privacy and trespass to chattels.

Bresnan responded by filing a motion to compel arbitration under the subscriber agreement and a motion to dismiss for failure to state a claim. In an opinion that did not address choice of law, the district court denied Bresnan's motion to compel arbitration. *Mortensen v. Bresnan Commc'n, LLC*, No. CV 10-13-BLG-RFC, 2010 WL 4716744, at *3–4 (D. Mont. Nov. 15, 2010). The decision applied Montana public policy requiring arbitration agreements in contracts of adhesion to be within a party's "reasonable expectations" and concluded that the arbitration agreement did not qualify because it amounted to unknowing waiver of the fundamental constitutional rights to trial by jury and access to courts. *Id.*

Almost a month later, the court granted in part Bresnan's motion to dismiss and discharged the Electronic Communications Privacy Act and Montana invasion-of-privacy claims. *Mortensen v. Bresnan Commc'n*, *LLC*, No. CV 10-13-BLG-RFC, 2010 WL 5140454, at *9 (D. Mont. Dec. 13, 2010).

Before discovery on the remaining Computer Fraud and Abuse Act claim and the state-law trespass-to-chattels claim, the Supreme Court decided *Concepcion*. Thereafter, Bresnan moved for and was granted leave to seek reconsideration of the denial of its motion to compel arbitration.

But in an order dated September 16, 2011, the district court concluded that although the Supreme Court's

characterization of the FAA in *Concepcion* "may impend doom for the Montana rules relied upon, it did not in itself kill them." Interpreting *Concepcion*'s holding as further limiting the savings clause only with respect to unconscionability and class-waiver provisions, the court compared the arbitration agreement in the present case with the one invalidated under *Concepcion* and found that they differed in that the current provision (1) was not unconscionable and (2) was not void because it contained a class-action waiver. In sum, the court found that the Montana reasonable expectations/fundamental rights rule survived *Concepcion*, served as the fundamental public policy supporting the application of Montana law (as opposed to New York law) under Montana choice-of-law rules, and required the court to deny arbitration.

Bresnan filed a timely appeal of that denial. It contends that the district court erred in finding that the Montana rule is not preempted by the FAA and, if preempted, New York choice of law should have applied, resulting in arbitration. Alternatively, Bresnan contends that after *Concepcion* an application of the Montana choice-of-law analysis does not justify rejection of New York law.

## II

We review *de novo* a district court's decision denying a motion to compel arbitration, including the interpretation of the validity and scope of the clause. *Bushley v. Credit Suisse First Bos.*, 360 F.3d 1149, 1152 (9th Cir. 2004); *see also Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). As arbitration is favored, those parties challenging the enforceability of an arbitration agreement bear the burden of proving that the provision is

unenforceable.  *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000).  We also review *de novo* the district court's decision concerning the appropriate choice of law. *Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1167 (9th Cir. 1995).

### III

We first address whether the FAA preempts Montana's reasonable expectations/fundamental rights rule and then address the choice-of-law consequences flowing from that conclusion.

### A.  Preemption of the Reasonable Expectations/Fundamental Rights Rule

The Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2.  And a state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" is preempted by the Supremacy Clause.  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  We start with an explanation of the FAA, the Supreme Court's *Concepcion* decision, and the Montana reasonable expectations/fundamental rights rule at issue in this case.  We then apply *Concepcion* to the Montana rule to decide whether it is preempted.

### 1.  The FAA

The FAA, enacted in 1925, facilitates private dispute resolution by making arbitration agreements in maritime transactions and in contracts involving interstate commerce presumptively "valid, irrevocable, and enforceable." *See also*

*Kilgore*, 2013 WL 1458876, at \*2 (quoting 9 U.S.C. § 2). The law was created to counter prevalent judicial refusal to enforce arbitration agreements,[7] *Concepcion*, 131 S. Ct. at 1745, and has been interpreted to embody "a liberal federal policy favoring arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The FAA "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Kilgore*, 2013 WL 1458876, at \*2 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)). Thus the FAA gives a strong boost to arbitration. *See Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013).

As federal substantive law, the FAA preempts contrary state law. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 400 (1967); *see also Concepcion*, 131 S. Ct. at 1746. The FAA's preemption power has an exception: It does not require the enforcement of arbitration agreements on "such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (also known as the "savings clause"). This savings clause preserves generally applicable contract defenses, such as fraud, duress, or unconscionability, and ensures that they are not preempted. *See Kilgore*, 2013 WL 1458876, at \*3; *see also Concepcion*, 131 S. Ct. at 1746.

---

[7] When arbitration was first emerging in the United States, the common law and early state statutes did not recognize the validity of predispute arbitration agreements and instead allowed either party to opt out and compel litigation. Thomas V. Burch, *Regulating Mandatory Arbitration*, 2011 Utah L. Rev. 1309, 1313 (2011).

Parties have often cited the savings clause in an attempt to defeat a motion to compel arbitration.[8]  The United States Supreme Court has been moved to step in and stop some efforts to avoid FAA preemption, most notably in its *Concepcion* decision.

### 2.  The *Concepcion* Decision and Its Progeny

*Concepcion* addressed whether the FAA's savings clause preempted a California state rule, known as the *Discover Bank* rule,[9] that invalidated the majority of class-action waivers in contracts of adhesion as unconscionable.

The facts involved a class of plaintiffs who purchased AT&T mobile service advertised as including a free phone. *Concepcion*, 131 S. Ct. at 1744.  Litigation resulted after

---

[8] Beginning in the mid-1990s, litigants employed general contract defenses, namely unconscionability, to avoid the FAA's pro-arbitration policy. *See, e.g.*, Aaron-Andrew P. Bruhl, *The Unconscionability Game: Strategic Judging and the Evolution of Federal Arbitration Law*, 83 N.Y.U. L. Rev. 1420, 1440–45 (2008).  There is some evidence that this tactic worked.  *See* Susan Randall, *Judicial Attitudes Toward Arbitration and the Resurgence of Unconscionability*, 52 Buff. L. Rev. 185, 194–96 (2004) (suggesting that about 50% of unconscionability challenges to arbitration agreements in 2002 and 2003 succeeded).

[9] *Discover Bank v. Superior Ct.*, 113 P.3d 1100 (Cal. 2005), *abrogated by Concepcion*, 131 S. Ct. at 1745–47.  Specifically, the *Discover Bank* rule invalidated class-action waivers in consumer agreements if (1) the agreement was in a contract of adhesion, (2) the disputes predictably involved small damages, and (3) the party with the inferior bargaining power alleged that the stronger party "carried out a scheme to deliberately" defraud.  113 P.3d at 1110.  But the rule was not limited to arbitration agreements and could be applied to all dispute-resolution contracts.  *Concepcion*, 131 S. Ct. at 1746–47.  It was therefore arguably "generally applicable."

plaintiffs were charged $30.22 in sales tax on the retail value of the phones.  *Id.*  The service contract signed by class members included a provision requiring all disputes to be arbitrated individually and not collectively.[10]  *Id.*

In its opinion, the Supreme Court reversed the Ninth Circuit's decision in *Laster v. AT&T Mobility LLC*, 584 F.3d 849, 853–59 (9th Cir. 2009), which held that the FAA did not preempt the *Discover Bank* rule because *Discover Bank* was generally applicable and thus was within the FAA's savings clause.  Instead, the Supreme Court reasoned that even general contract defenses, such as unconscionability, are preempted if they "stand as an obstacle to the accomplishment" of  "ensur[ing] that private arbitration agreements are enforced according to their terms." *Concepcion*, 131 S. Ct. at 1748 (quoting source omitted).

The Supreme Court acknowledged that the "inquiry becomes more complex when a doctrine normally thought to be generally applicable . . . is alleged to have been applied in a fashion that disfavors arbitration."  *Id.* at 1747.  But it concluded for the first time that even generally applicable state-law rules are preempted if in practice they have a

---

[10] The agreement provided that AT&T would pay all costs for the arbitration of nonfrivolous claims; that arbitration would occur in the county where there customer was billed; that, for claims of $10,000 or less, the customer could choose whether to arbitrate in person, on submissions, or by phone; that either party could bring a claim in small claims court in lieu of arbitration; that the arbitrator could award any form of individual relief; that AT&T could not seek reimbursement of its attorney's fees; and that, if a customer won an arbitration award greater than AT&T's last written settlement offer, AT&T would pay $7,500 in minimum recovery plus twice the amount of the claimant's attorney's fees. *Concepcion*, 131 S. Ct. at 1744.

"disproportionate impact" on arbitration or "interfere[] with fundamental attributes of arbitration and thus create[] a scheme inconsistent with the FAA." *Id.* at 1747–48.

In *Marmet Health Care Center, Inc. v. Brown*, the Supreme Court put an exclamation point on the savings clause's new limits that it had established in *Concepcion*. *See* __ U.S. __, 132 S. Ct. 1201, 1203 (2012). In *Marmet* the Court held that the FAA preempted a West Virginia law invalidating arbitration clauses in nursing home admission agreements adopted before an occurrence of negligence resulting in a personal injury or wrongful death: "When state law prohibits . . . the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA." *Id.* at 1203.

We interpret *Concepcion*'s holding to be broader than a restriction on the use of unconscionability to end-run FAA preemption. We take *Concepcion* to mean what its plain language says: Any general state-law contract defense, based in unconscionability or otherwise, that has a disproportionate effect on arbitration is displaced by the FAA. We find support for this reading from the illustration in *Concepcion* involving a case "finding unconscionable *or unenforceable as against public policy* consumer arbitration agreements that fail to provide for judicially monitored discovery." 131 S. Ct. at 1747 (emphasis added). Other courts have read *Concepcion* in a similar way.[11]

---

[11] *See, e.g.*, *In re Cal. Title Ins. Antitrust Litig.*, No. 08-01341 JSW, 2011 WL 2566449, at *2 (N.D. Cal. June 27, 2011) ("In the wake of new Supreme Court precedent" the court was "compelled to enforce the . . . arbitration provisions[.]"); *Wolf v. Nissan Motor Acceptance Corp.*, No. 10-cv-3338 (NLH)(KMW), 2011 WL 2490939, at *6–7 (D.N.J. June 22,

Some might argue that our interpretation of *Concepcion* goes too far beyond the initial purpose of the FAA, which was to eliminate judicial hostility toward arbitration and place arbitration provisions on "the same footing" as all other contractual provisions. *See Iwen*, 977 P.2d at 994; *see also Supak & Sons Mfg. Co. v. Pervel Indus., Inc.*, 593 F.2d 135, 137 (4th Cir. 1979). But we follow the Supreme Court's premise in *Concepcion* that the FAA's purpose is to "ensur[e] that private arbitrations are enforced." 131 S. Ct. at 1748 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989)); *see also Am. Express Co. v. Italian Colors Rest.*, __ S. Ct. __, No. 12-133, 2013 WL 3064410, at *6 & n.5 (June 20, 2013) (noting that *Concepcion* established that "the FAA's command to enforce arbitration agreements trumps any interest in ensuring the prosecution of low-value claims"). The word "ensure" is defined to mean "to make (one) sure (as by pledging, guaranteeing, convincing, or declaring)" or "to make sure, certain, or safe: GUARANTEE." Webster's Third New International Dictionary 756 (1993). In our view, *Concepcion* crystalized the directive, touched on in *Volt*, 489 U.S. at 474, that the FAA's purpose is to give preference (instead of mere equality) to arbitration provisions. 131 S. Ct. at 1748. *Concepcion* outlaws discrimination in state policy that is unfavorable to arbitration by further limiting the savings clause. We are bound by our duty to apply *Concepcion* and do so here.

---

2011) ("[N]otwithstanding [state law], the Court is bound by [*Concepcion*]."); *see also Muriithi*, 712 F.3d at 180 (noting that "*Concepcion* sweeps . . . broadly" to preempt generally applicable contract defenses that "target[] the existence of an agreement to arbitrate as the basis for invalidating that agreement").

### 3.  The Montana Reasonable Expectations/Fundamental Rights Rule

We apply *Concepcion* to the Montana reasonable expectations/fundamental rights rule to determine whether it is preempted by the FAA.

Under Montana state law, courts determining the validity of a contract begin with assessing whether the contract is one of adhesion.  *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir. 2001); *Iwen*, 977 P.2d at 995.  This inquiry focuses on the contracting process to determine whether both parties had the ability to negotiate contract terms.  *Iwen*, 977 P.2d at 995.  Finding that the contract was adhesive opens the door for an unconscionability or public policy defense.  *Id.*

Once a court views a contract as adhesive, it must examine the challenged provision to determine whether it is unconscionable or in violation of public policy.  *Id.*  A provision that was not in the reasonable expectations of both parties when contracting is void as against public policy.[12]  *Id.* (referring to *Passage v. Prudential-Bache Sec., Inc.*, 727 P.2d 1298, 1301 (Mont. 1986)).  As a matter of law, Montana finds involuntary waiver of fundamental constitutional rights to be outside of consumers' reasonable expectations.  *Kortum-Managhan*, 204 P.3d at 698–99.

---

[12] Montana courts construe the public policy defense as slightly different from an unconscionability defense.  The unconscionability defense is analyzed through use of the *Kloss* factors and does not rely on the reasonable expectations test.  *See Kloss v. Edward D. Jones & Co.*, 54 P.3d 1, 8–9 (Mont. 2002).

Because the Montana Supreme Court has held that arbitration agreements constitute a waiver of a party's fundamental constitutional rights to trial by jury and access to courts, all arbitration agreements where waiver is not "voluntarily, knowingly, and intelligently" made are void as a matter of public policy. *Id.* at 699 (citations omitted). Montana law defines "voluntarily, knowingly, and intelligently" made as requiring a consumer to be informed of the consequences of a provision and to personally consent to waiver after receiving the proper information. *Id.* Under this generally applicable rule, only arbitration agreements explained to and initialed by consumers are valid and enforceable. *See id.*

### 4.  The Effect of *Concepcion* on the Reasonable Expectations/Fundamental Rights Rule

Bresnan first contends that the Montana reasonable expectations/fundamental rights rule is not preserved by the FAA's savings clause because it is not generally applicable given that it depends on the unique nature of arbitration agreements.[13] Bresnan supports this assertion by urging that, unlike other contract provisions, arbitration agreements implicate fundamental rights.  It contends that, even without

---

[13] While arguing that the Montana rule is not generally applicable, Bresnan contends surprisingly that the "reasonable expectations" test is one based on unconscionability—a quintessential generally applicable contract defense.  The Montana reasonable expectations/fundamental rights rule is related to the unconscionability doctrine.  The relationship is shown by the Montana Supreme Court's application of the *Kloss* unconscionability factors to the fundamental rights analysis in *Kortum-Managhan*, 204 P.3d at 699–700.  But because prior cases have said that the defenses are different, we decline to hold otherwise. *See, e.g.*, *Iwen*, 977 P.2d at 995; *Kloss*, 53 P.3d at 8.

*Concepcion*, the rule is preempted.  We disagree.  Bresnan may be correct that the reasonable expectations/fundamental rights rule has a disproportionate impact on arbitration agreements.   But the rule does not invalidate only those agreements.  Many other types of agreements may be equally affected by the Montana rule.   And contract provisions requiring bench trials waive the fundamental right to a jury trial.  We cannot say that the fundamental-rights rule depends entirely on the nature of arbitration agreements.

Bresnan next contends that even if the doctrine is one of general applicability, it disproportionally affects arbitration agreements and thus is preempted by the FAA following *Concepcion*.    We agree.     The Montana reasonable expectations/fundamental rights rule arose from state court consideration of adhesive arbitration agreements, s*ee Kortum-Managhan*, 204 P.3d at 698–700, and most of the rule's applications have been to those provisions, *see, e.g.*, *Ticknor*, 265 F.3d at 931; *Kloss*, 53 P.3d at 7–8.  Courts, including this one, considering Montana's public policy repeatedly refer to it in arbitration-specific terms.  *See, e.g.*, *Ticknor*, 265 F.3d at 939 ("In the context of adhesion contracts, the Montana Supreme Court has determined expressly that it will not enforce an [unfair] arbitration clause." (citing *Iwen*, 977 P.2d at 996)).  Because of this, we conclude that the reasonable expectations/fundamental rights rule runs contrary to the FAA   as   interpreted   by   *Concepcion*   because   it disproportionally   applies   to   arbitration   agreements, invalidating them at a higher rate than other contract provisions.  We hold that the FAA preempts the Montana

reasonable expectations/fundamental rights rule as that rule is currently employed.[14]

## B.  The Effect of Preemption on Choice-of-Law Considerations

Now that we have determined that the Montana reasonable expectations/fundamental rights rule is preempted by the FAA, we assess the consequences that flow from that conclusion.  Federal courts sitting in diversity use the choice-of-law rules of the forum state, in this case Montana, to make a choice-of-law determination.  *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001); *see also Sparling v. Hoffman Constr. Co., Inc.*, 864 F.2d 635, 641 (9th Cir. 1988).  Montana uses the Restatement (Second) of Conflict of Laws § 187(2), which finds a choice-of-law provision overcome where (1) Montana has a materially greater interest in the transaction than the state whose law was selected by the parties and (2) application of the selected state's law would be contrary to Montana's public policy. *Ticknor*, 265 F.3d at 937–38.

In assessing whether Montana has a materially greater interest in the transaction, Montana law considers the place of contracting; the place where the contract was negotiated; the

---

[14] This holding is consistent with extra-circuit precedent because the Montana reasonable expectations/fundamental rights rule "bar[s] the arbitration of entire categories of claims," essentially all adhesive consumer arbitration agreements, and "disfavors arbitration." *See Noohi*, 708 F.3d at 611–13 (holding that a Maryland law requiring an arbitration provision to contain a mutually coextensive exchange of promises to arbitrate was not preempted by the FAA following *Concepcion* because all it did was "treat an arbitration provision like a stand-alone contract, requiring consideration" and did not disfavor arbitration).

place of performance; the location of the subject matter of the contract; and the domicile, residence, nationality, place of incorporation and place of business of the parties. *Id.* at 938; *see also Keystone*, *Inc. v. Triad Sys. Corp.*, 971 P.2d 1240, 1242 (Mont. 1998) (applying the five factors from the Restatement (Second) of Conflict of Laws § 188 to determine if Montana had a materially greater interest in the transaction). Here, after applying these factors, the district court correctly concluded that Montana had a materially greater interest than New York in the dispute. The contract was received by the consumers in Montana as part of their Welcome Kit, and the contract governed services provided in Montana to Montana residents. The subject matter of the contract and performance of it took place almost entirely in Montana.

But the second prong of the choice-of-law analysis, requiring an application of New York law to be contrary to the fundamental public policy of Montana, is lacking. The parties have briefed the differences between New York and Montana policies with respect to the relative favor (or lack thereof) that they show to arbitration agreements. In the district court, the judge noted that this prong was fulfilled because "application of New York law would contravene the fundamental public policy of Montana in that fundamental rights would be waived without notice." Because Montana's reasonable expectations/fundamental rights rule is preempted, we conclude that it cannot serve as a basis for rejecting the choice-of-law selection of the parties. We have found no other policy, not preempted by the FAA, that would justify the application of Montana law. We hold that the district court should have applied New York law to the arbitration agreement.

# IV

This is not an easy case as it requires us to interpret *Concepcion* and apply that law to an established Montana rule that governs the validity of contracts generally but has a disproportionate impact on arbitration agreements. Montana has an interest in protecting its consumers from unfair agreements, particularly those that force waiver of fundamental rights without notice. But the Supreme Court in *Concepcion* told us to hold that the FAA preempts all laws that have a disproportionate impact on arbitration agreements. Given this directive, we hold that the Montana reasonable expectations/fundamental rights rule is preempted by the FAA. Because (1) a state's preempted public policy is an impermissible basis on which to reject the parties' choice of law and (2) under Montana choice-of-law analysis, courts cannot ignore the law selection of the parties unless it would contravene a fundamental state policy, the district court erred in failing to apply New York law. We vacate the district court's denial of Bresnan's motion to compel arbitration and remand to the district court with instructions to apply New York law to the agreement.

**VACATED AND REMANDED.**